UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States, Civil No. 07-3639 JMR/FLN

Petitioner,

v. **REPORT AND RECOMMENDATION**

Albert Hicks,

Respondent.

---

Mary Trippler, Assistant United States Attorney, for Petitioner.
Katherine Menendez, Assistant Federal Public Defender, for Defendant.

---

**THIS MATTER** came before the undersigned United States Magistrate Judge on September 20, 2007, for a hearing on the Government's Petition to Determine the Present Mental Status of an Imprisoned Person Under 18 U.S.C. § 4245 [#1], at the Federal Medical Center ("FMC") in Rochester, Minnesota. The Petition alleges that Albert Hicks presently suffers from a mental disease or defect for the treatment of which he is in need of custody and care in a suitable psychiatric facility. Federal Medical Center Staff Psychiatrist Dr. Daniel J. Shine testified on behalf of the Government. Respondent Albert Hicks testifed on behalf of himself. The Government submitted

five exhibits into evidence.[1] For the reasons that follow, the Court recommends that the Petition be granted.

## I. FINDINGS OF FACT

### A. Hicks's History of Mental Illness

Respondent Albert Hicks ("Hicks") is currently serving a 264-month sentence imposed on May 28, 1992, by the United States District Court, Southern District of Florida, for possession of a firearm by a convicted felon and false statement in acquisition of a firearm. *See* Gov't. Ex. A, Order Amending Judgment Commitment Order. He is scheduled for release on February 20, 2010.

The record reveals that Hicks has exhibited psychotic symptoms through most of his adult life. On March 12, 1969, a psychologist with the Florida Division of Corrections evaluated Hicks and diagnosed Hicks with "characteristics of a dysocial personality, but no sign of gross psychopathology." *See* Gov't. Ex. 2, Mental Health Evaluation, p. 2. In October 1974, a Florida state court found Hicks not competent to stand trial for a charge of assault with the intent to commit murder and ordered him committed to the South Florida State Hospital. *Id.* at 1-2. At that time, Hicks was diagnosed with an "acute schizophrenic episode with drug abuse in remission." *Id*. at 2. On November 11, 1977, a forensic evaluation was conducted on Hicks regarding a charge of battery on a police officer. *Id*. The forensic evaluation was not completed because the interview was

---

[1]

| | |
|---|---|
| Gov't. Ex. 1: | Dr. Shine's curriculum vitae. |
| Gov't. Ex. 2: | Mental health evaluation conducted on Respondent Hicks at FMC Rochester on June 15, 2007. This document was also submitted as Exhibit B to the Government's Petition. |
| Gov't. Ex. 3: | Respondent Hicks's Medical File. |
| Gov't. Ex. 4: | Respondent Hicks's Psychology Data System Records. |
| Gov't. Ex. 5: | Respondent Hicks's Central File. |

unsuccessful. *Id*. During 1989 and 1990, Hicks was admitted to Broward General Hospital for two-to-three days for psychiatric care and Imperial Point hospital for two weeks of treatment. *Id*.

In May 1992, Hicks was found guilty of the offenses giving rise to his current incarceration. During 1992, Hicks was placed on a suicide watch for two periods of time. *Id*. The suicide watches were initiated by Hicks after he complained of auditory hallucinations encouraging harm upon himself. *Id*. At this time, Hicks complained of hearing the voice of George Foreman, a professional boxer; he indicated that he had heard Mr. Foreman's voice since 1974. *Id*. at 3. Hicks requested an increase in his prescribed antipsychotic medications in hope that they would alleviate the auditory hallucinations. *Id*. Hicks medications were adjusted and an improvement occurred. *Id*. Also during 1992, Hicks was treated for mental illness at FMC in Butner, North Carolina, and diagnosed with Schizophrenia, paranoid type, and cocaine abuse. *Id*. Hicks was prescribed medication to manage his mental illness and transferred to the Federal Correctional Institute ("FCI") at Petersburg, Virginia, on June 16, 1993. *Id*. Later in 1993, Hicks was transferred to the FCI in Marianna, Florida. *Id*.

In May 1994, Hicks complained of difficulties with his medication and the dosage was lowered. *Id*. After the dosage was lowered, Hicks's condition began to worsen and he was ultimately placed on a formal suicide watch on November 13, 1994. *Id*. The formal suicide watch was in response to auditory hallucinations and Hicks's fear that he might hurt himself. *Id*. Hicks requested to be placed back on psychiatric medications, subsequently his condition improved. *Id*.

During June 1997, Hicks stopped taking one of his psychotropic medications because he felt it was no longer necessary. *Id*. Shortly thereafter, Hicks was place on suicide watch due to sleep

disturbances, agitation, and increased auditory hallucinations encouraging him to hurt himself. *Id*. Hicks agreed to go back onto his psychotropic medications and his mental health improved. *Id*.

During February 2001, while still at FCI Marianna, Hicks again refused to take his medication based upon his claim that the side effects were worse than the benefits. *Id*. at 4. Over time, Hicks's condition began to worsen. *Id*. Hicks experienced an increase in auditory hallucinations, his hygiene deteriorated, and his work productivity dropped off. *Id*. Eventually, Hicks requested to be placed and was placed back on suicide watch due to auditory hallucinations. *Id*. At that time, Hicks was recommended for a transfer to FMC Butner. *Id*. However, Hicks showed improvement and the recommendation for transfer was withdrawn. *Id*.

On August 19, 2003, Hicks was placed back onto a suicide watch for self-reported auditory hallucinations that encouraged him to harm himself. *Id*. The staff at FCI Marianna recommended Hicks for transfer to a medical center. *Id*. The transfer request was based upon Hicks's weight loss, poor hygiene, disorganized behavior, disorganized thoughts, auditory hallucinations, and paranoia. *Id*. In October 2003, Hicks was transferred to FMC Rochester; at that time, no medications were prescribed because Hicks had refused medication for the past few years. *Id*.

At FMC Rochester, the staff described Hicks as "actively psychotic and endorsing auditory hallucinations involving sports and 'strange things.'" *Id*. After a month at FMC Rochester, Hicks began to adjust to his new surroundings, had better organization, and his auditory hallucinations decreased. *Id*. After another month, Hicks stopped taking the antipsychotic medication he previously agreed to take. *Id*. Hicks started to become easily agitated and staff described him as having "somewhat of an aggressive attitude." *Id*. at 5. By January 2004, Hicks still refused antipsychotic medications because he believed he was not mentally ill and taking medication would

jeopardize financial assistance he was to receive outside prison. *Id*. Although Hicks was unmedicated, his ability to function slightly improved to the point where he could follow verbal orders; his active symptoms of psychosis were described as being in a residual phase. *Id*. Based upon Hicks refusal for treatments, the stabilization of symptoms, and his desire to return to a mainline correctional institute, Hicks was transferred from FMC Rochester to FCI Marianna in June 2004. *Id*.

Hicks was at FCI Marianna from June 2004 to July 2006, when he was transferred back to FMC Rochester. *Id*. During that time, Hicks refused any psychiatric treatment. *Id*. He maintained the minimum level of acceptable hygiene. *Id*. During the majority of his last stint at FCI Marianna, Hicks was housed with the general population. *Id*. On February 7, 2006, Hicks was accused of assaulting his cellmate. Id. Hicks claimed that he physically assaulted his cellmate because his cellmate verbally assaulted him. *Id.* During a disciplinary proceeding, Hicks was found competent and responsible for the assault. *Id*. On June 27, 2006, Hicks reported to staff that an unidentified inmate made a homosexual overture toward him and he was "not going to let [the unidentified inmate] have his way with me." *Id*. Following the incident on June 27, 2006, Hicks was seen walking the halls with his index finger raised above his head. *Id*. Hicks stated that he had his finger in the air because he was number one and the U.S is number one. *Id*. Then, Hicks became agitated, declared his right to express himself, and stated a resistance to any treatment. *Id*. During this exchange, Hicks stated that he was hearing voices, but he would not discuss the voices with anyone. *Id*. Hicks also told a psychologist that he had a contract on his or her life. *Id*. Shortly thereafter, Hicks was transferred back to FMC Rochester. *Id*.

Upon arrival at FMC Rochester on July 19, 2006, Hicks was diagnosed with chronic Schizophrenia, undifferentiated type, and he refused psychotropic medications. *Id*. at 6. Hicks exhibited no insight into his mental illness. *Id*. The staff described him as "cooperative though distracted." *Id*.

On August 23, 2006, Hicks was accused of refusing to work and being insolent to a staff member. *Id*. Hicks refused to work and screamed at the correctional officer, calling him a "devil." *Id*. Hicks claimed that he was a free man and would not be made to work. *Id.* Hicks went on to state that he was there for treatment, not to work. *Id*. During a disciplinary proceeding on this incident, Hicks was found competent and responsible for the assault. *Id*.

After the incident, Hicks reported auditory hallucinations. *Id*. He attributed the auditory hallucinations to "the Mafia." *Id*. He also told his psychologist that "There is nothing to do. The meds won't help. You just learn to tolerate them . . . I don't believe in medication, they just calm you down, it never took away the voices." *Id*.

On October 1, 2006, Hicks stated that he believed he was "Jesus Christ." *Id*. On October 16, 2006, Hicks was accused of threatening another with bodily harm, insolence toward a staff member, and refusing to obey an order. *Id*. The allegation was based upon Hicks's conduct toward a counselor that ordered him to perform his work. *Id*. When questions about the incident, Hicks became aggressive and agitated. *Id.* Hicks called the counselor derogatory names and threatened to kill her. *Id*. During a disciplinary proceeding, Hicks was found competent and responsible for the assault. *Id*.

When Hicks first arrived at FMC Rochester, he was placed on the mental health unit. *Id*. On December 16, 2006, he was transferred into the general population at FMC Rochester. *Id*. at 7.

The transfer to the general population was made because Hicks refused treatment and exhibited an ability to function on the open unit. *Id*. The decision was made to transfer Hicks within FMC Rochester so that he could be quickly brought back to the mental health unit if he began to decompensate. *Id*. On May 15, 2007, Hicks was transferred back to the mental health unit. *Id*. The transfer was due to Hicks making threatening statements and an increase in his level of agitation. *Id*. Hicks also reported an increase in auditory hallucinations in the form of his cellmates. *Id*. He claimed that his cellmates were the "demons and devils." *Id*. He also express difficulties with "Muslims, Klansman, and the Holy Bible." *Id*.

After the incident on May 15, 2007, until May 25, 2007, Hicks was described as having a flat affect. *Id*. He described hallucinations related to religious books. *Id*. A psychiatrist described him as "less agitated but still delusional." *Id*. On May 25, 2007, Hicks reported "auditory hallucinations in the form of demonic voices trying to sabotage him and lead him into evil. *Id*. He also reported that he is the "'wonderful'out of the Holy Bible." *Id*. He claimed to reign over all illegal activity in the world. *Id*.

Following this incident, a mental health evaluation was performed. *See id*. Hicks refused to engage in any psychological testing. *Id*. at 8. The evaluation concluded that Hicks displays symptons of Schizophrenia, paranoid type. *Id*. He expressed persecutory beliefs and beliefs involving demonic religious themes. *Id*. He typically experiences delusions that are persecutory, but occasionally grandiose in nature. *Id*. Auditory hallucinations typically accompany his delusions. *Id*. The delusions increase with Hicks's level of agitation. *Id*. The delusions and hallucinations have lead to Hicks threatening violence upon others. *Id*.

The mental health evaluation found that, absent mental health treatment, Hicks has a poor prognosis. *Id*. at 9. Spontaneous remission is not common with his illness and it is likely that he will continue to be aggressive toward others. *Id*. On the other hand, Hicks's prognosis is much better with mental health treatment based upon his history of responding to treatment. *Id*. It is recommended that he receive "inpatient hospitalization in a mental health unit of a BOP medical center, where he can be provided with appropriate psychiatric medications, psychotherapy, activity therapy, and psychoeducational rehabilitation. *Id*.

**B. Dr. Shine's Testimony**

In his testimony at the hearing, FMC Staff Psychiatrist Dr. Daniel J. Shine testified consistent with his report, which provided the basis for Hicks's Mental History as stated above. Dr. Shine stated that he has had eight to ten conversations with Hicks since his transfer to FMC Rochester. He stated that Hicks suffered from severe and persistent Schizophrenia, undifferentiated form. This diagnosis differed slightly from his previous diagnosis of Schizophrenia, paranoid type. Dr. Shine stated that the diagnosis of undifferentiated form was based upon Hicks having auditory hallucinations, paranoid delusions of persecution, grandiose delusions, disorganized thought, bizarre speech, disorganized behavior and a flat affect. Dr. Shine explained that an undifferentiated diagnosis accounted for more symptoms than a diagnosis of paranoid type. He stated that since Hicks has been at FMC he has demonstrated no insight that he suffers from a mental illness.

Dr. Shine testified that Hicks's symptoms currently interfere with his functioning and behavior. He testified that Hicks exhibits aggressive behavior that could precipitate harm to himself or others. Dr. Shine also testified that Hicks agitation over simple things makes him very

unpredictable. His mental state prevents him from participating in any of the available institutional programs, such as group therapy.

Hicks's delusions and agitation prevent him from living in any unit other than a semi-locked mental health wing. Dr. Shine testified that Hicks is always in a triage designation and never a treatment designation while on the semi-locked mental health wing.

Defendant's counsel asked Dr. Shine why Hicks required needed treatment, after the staff at FCI Marianna reported that they were able to handle Hicks's behavior. *See* Gov't Ex. 4 at 62 (memorandum describing Hicks's behavior and encouraging staff not to panic unless Hicks's deviated from his normal behavior, which included "drinking from the toilet, crawling on the cell floor, and going through the trash for cigarette butts."). Dr. Shine testified he strongly disagreed with the assessment of the staff at FCI Marianna that Hicks was able to function there. Dr. Shine testified that he considered drinking from the toilet to be a mental health emergency and would not have considered this to be acceptable behavior.

Dr. Shine stated that Hicks's condition necessitates medication and therapy in a hospital setting. Without appropriate mental care, Hicks's symptoms are unlikely to remit, and his symptoms may intensify. Dr. Shine stated that without treatment, Hicks could pose a threat to others and he could become not functioning. Dr. Shine believes treatment will alleviate Hicks's suffering, allow him to get on the program, and enable him to be functioning upon his release from prison. Based on his response to previous treatment, he predicted that, if treated, Hicks's prognosis would be improved. He testified that FMC Rochester is an appropriate facility to provide Hicks's treatment needs.

**C. Albert Hicks's Testimony**

Hicks testified on his own behalf. He stated that he is not mentally ill. He does not want to take any medication or receive treatment because they do not help. He stated that he does fine on the unit. He performs his cleaning job, eats in the kitchen and engages in recreation. When asked about his thoughts on medication he stated that he believes that the "solution to the problem is greater than the problem itself."

## II. LEGAL ANALYSIS

Pursuant to 18 U.S.C. § 4245, a federal prisoner may not be transferred to a mental hospital or treatment facility without the prisoner's consent or a court order. *See United States v. Watson*, 893 F.2d 970, 975 (8th Cir. 1990), vacated in part on other grounds by *United States v. Holmes*, 900 F.2d 1322 (8th Cir. 1990). If the prisoner objects to being transferred, the court must hold a hearing to determine if there is "reasonable cause to believe that the person may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility." 18 U.S.C. § 4245(a); *United States v. Jones*, 811 F.2d 444, 447 (8th Cir. 1987). If, after the hearing, the court finds by a preponderance of the evidence that the person is presently suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility, the court shall commit the person to the custody of the Attorney General. 18 U.S.C. § 4245(d). Whether a person is in need of care or treatment is a question of fact, left to the judicial decision maker. *Watson*, 893 F.2d at 972. If the court determines that the inmate is suffering from a mental disease and is in need of treatment, the Attorney General must then hospitalize the prisoner "for treatment in a suitable facility until he is

no longer in need of such custody for care or treatment or until the expiration of the sentence of imprisonment, whichever occurs earlier." 18 U.S.C. § 4245(d).

This Court is therefore required to determine three issues: 1) whether Hicks suffers from a mental disease or defect; 2) whether Hicks is in need of custody for care or treatment of that disease or defect; and 3) whether FMC, the proposed facility, is a suitable facility. For the reasons set forth below, this Court concludes that the answer to all of these questions is yes.

**A. Mental Disease or Defect**

The Government has met its burden of establishing by a preponderance of the evidence that Hicks suffers from a mental disease or defect. See 18 U.S.C. § 4245(d) (burden of proof). Dr. Shine testified that he diagnosed Hicks as suffering from severe and persistent Schizophrenia. Dr. Shine based his assessment on Hicks's records and central file, his personal interactions with him, and reports from other FMC staff. Dr. Shine testified that Hicks suffers numerous symptoms indicative of his mental disease, including auditory hallucinations, paranoid delusions of persecution, grandiose delusions, disorganized thought, and bizarre speech. Hicks has exhibited these symptoms, to some extent, throughout his adult life. Based on Dr. Shine's expert opinion and the records before the Court, we conclude that the government has satisfied its burden of showing by a preponderance of the evidence that Hicks suffers from a mental disease or defect, specifically Schizophrenia.

**B. In Need of Custody for Care or Treatment**

This Court finds that Hicks is in need of custody for care or treatment. The term "need" is not defined by 18 U.S.C. § 4245. Whether a person is in need of care or treatment is a question of fact, left to the judicial decision maker. In order to be needed, treatment must be more than merely beneficial to the prisoner. *See United States v. Eckerson*, 299 F.3d 913 (8th Cir. 2002); *United States*

*v. Horne*, 955 F.Supp. 1141, 1147 (D. Minn. 1997). The Eighth Circuit in *Watson*, 893 F.2d 982, held that it is more favorable to restore an inmate's ability to function in the general population through forced medication, than keep an inmate in seclusion, even if he functioned adequately there. In other words, the court in *Watson* found that "need" does exist if treatment would enable the prisoner to function in the general population.

Here the government has established "need" by proving that Hicks cannot function in the general prison population. He is in a frequent state of agitation and paranoia. He is prone to aggressive behavior. He is unable to interact with others or participate in available therapy programs. FMC staff considers Hicks a danger to himself or others. Under these circumstances, we conclude that Hicks is in need of custody for care and treatment.[2]

We also conclude that FMC is a suitable facility for Hicks's treatment. Dr. Shine testified that FMC would be a suitable facility and Hicks has not presented any evidence to the contrary.

**III. RECOMMENDATION**

[2] The issue of whether or not the government may forcibly administer anti-psychotic medications to Hicks is not before the Court. The government did not request a determination whether Hicks could be involuntarily medicated in its Petition. *See e.g., United States v. Prestenbach*, 168 F.3d 496 (8th Cir. 1999) (issue of forcible medication not before the court where the government's petition did not request a decision on whether or not medication may be involuntarily administered); *Watson*, 893 F.2d at 975 (section 4245 addresses only whether an inmate may be transferred to a facility for psychiatric treatment; it does not define "treatment," nor authorize the forcible administration of psychotropic drugs); United States v. Horne, 955 F.Supp. 1141, 1150-51 (D.Minn. 1997) (premature for court to address issue of forced administration of anti-psychotic drugs at commitment stage).

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED THAT** the United States Petition to Determine Present Mental Condition of an Imprisoned Person under 18 U.S.C. § 4245 [#1] be **GRANTED**. Hicks should be committed to the custody of the Attorney General and hospitalized at FMC Rochester.

Dated: October 17, 2007

s/ Franklin L. Noel
FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before November 5, 2007, written objections which specifically identify the portions of the proposed findings, recommendations or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service of the objections. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by November 5, 2007 a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Circuit Court of Appeals.